# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK MCMORROW, *et al.*, | Case No. 17-cv-2327-BAS-JLB |
| Plaintiffs, | **ORDER:** |
| v. | **(1) DENYING MOTION FOR CLASS CERTIFICATION;** |
| MONDELĒZ INTERNATIONAL, INC., | **(2) GRANTING MOTION TO EXCLUDE EXPERT TESTIMONY OF J. MICHAEL DENNIS; AND** |
| Defendant. | **(3) GRANTING MOTION TO EXCLUDE EXPERT TESTIMONY OF COLIN WEIR.** |
| | **[ECF Nos. 70, 87, 90]** |

Plaintiffs Patrick McMorrow, Marco Ohlin, and Melody DiGregorio bring the instant putative class action against Defendant Mondelēz Global LLC.[1] Defendant sells a line of belVita Breakfast Products and Plaintiff alleges Products' labels are misleading. Plaintiffs now request this Court certify two classes. ("Mot.," ECF No.

---

[1] Mondelēz Global LLC was incorrectly sued as Mondelēz International, Inc.

– 1 –
17cv2327

70-1.) Defendant opposes the Motion. ("Opp'n," ECF No. 86.)[2]

The Court held oral argument on the motion on March 9, 2020. For the reasons detailed below, the Court **DENIES** Plaintiffs' Motion without prejudice.

## I. BACKGROUND

Mondelēz Global LLC ("MDLZ") sells belVita Breakfast Products. The Products come in four varieties: belVita "Crunchy" Biscuits, belVita "Soft Baked" Biscuits, belVita "Bites," and belVita "Sandwiches" (hereinafter, "the Products). (Second Amended Complaint, "SAC," ECF No. 24, ¶ 114.) Plaintiffs allege the following claims on the Products' packaging are misleading:

- "NUTRITIOUS SUSTAINED ENERGY"
- "NUTRITIOUS STEADY ENERGY ALL MORNING"
- "4 HOURS OF NUTRITIOUS STEADY ENERGY"
- "We worked closely with nutritionists to design a new kind of breakfast biscuit with energy for the morning. Energy that is nutritious and sustained."
- "We worked closely with nutritionists to design belVita Breakfast Biscuits."
- "We all need energy to start the morning. We also need a delicious, wholesome breakfast. Baked with hearty whole grains, belVita Soft Baked Breakfast biscuits are delicious, nutritious . . . ."

(*Id.* ¶¶ 128, 133, 138, 143.) Plaintiffs allege the Products' labels are misleading because the Products are not healthy and in fact "increase the risk of serious

---

[2] Six other motions are pending in this case, wherein the parties seek to exclude the opinions of the other side's experts. As relevant here, Defendant seeks to exclude Plaintiffs' damages experts, Dr. J. Michael Dennis and Colin Weir. (ECF Nos. 87, 90.) The Court finds in this order that Plaintiffs' damages model, presented through Dennis and Weir, does not measure only the damages attributable to their liability theory. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 34–35 (2013) (quotation omitted). It follows that Dennis' and Weir's opinions and testimony are therefore not relevant. *See Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1024 (C.D. Cal. 2018) (striking an expert's testimony after finding his survey results are irrelevant because the survey analysis "is untethered to Plaintiffs' theory of liability). The Court therefore **GRANTS** Defendants' motions to exclude the testimony of Dennis and Weir. (ECF Nos. 87, 90.)

The Court did not consider the merits of the opinions or reports of the other expert witnesses in analyzing the present Motion.

diseases." (*Id.* ¶ 129.) As detailed more in this Order, Plaintiffs mainly take issue with Defendant's use of the word "nutritious" despite the amount of added sugar in the Products. (*See*, *e.g., id.* ¶ 124.) Plaintiffs allege that consumption of the Products "causes increased risk of CHD, stroke, and other morbidity." (*Id.* ¶ 174.) Plaintiffs allege the Products' labeling violates California, New York, and federal law. Plaintiffs' theory of damages is based on their contention that Defendant can charge a higher price for the Products due to the allegedly misleading labels. Plaintiffs seek class certification of the following classes:

> **California Class:** All persons in California who, on or after November 16, 2013 purchased for household use and not for resale or distribution, belVita products bearing the phrase "NUTRITIOUS STEADY ENERGY," "NUTRITIOUS SUSTAINED ENERGY" or "NUTRITIOUS MORNING ENERGY".
>
> **New York Class:** All persons in New York who, on or after January 2, 2015 purchased for household use and not for resale or distribution, belVita products bearing the phrase "NUTRITIOUS STEADY ENERGY," "NUTRITIOUS SUSTAINED ENERGY," or "NUTRITIOUS MORNING ENERGY".

(ECF No. 70, at 2.)

## II. LEGAL STANDARD

Motions for class certification proceed under Rule 23(a) of the Federal Rules of Civil Procedure. Rule 23(a) provides four prerequisites to a class action: (1) the class is so numerous that joinder of all members is impracticable ("numerosity"), (2) there are questions of law or fact common to the class ("commonality"), (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"), and (4) the representative parties will fairly and adequately protect the interests of the class ("adequate representation"). Fed. R. Civ. P. 23(a).

A proposed class must also satisfy one of the subdivisions of Rule 23(b). Here, Plaintiffs seek to proceed under Rule 23(b)(3), which requires that "the court find[] that the [common questions] predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The relevant factors in this

inquiry include the class members' interest in individually controlling the litigation, other litigation already commenced, the desirability (or not) of consolidating the litigation in this forum, and manageability. Fed. R. Civ. P. 23(b)(3)(A)–(D).

"In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974). "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Rather, "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Id.* The court is "at liberty to consider evidence which goes to the requirements of Rule 23 even though the evidence may also relate to the underlying merits of the case." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 509 (9th Cir. 1992). A weighing of competing evidence, however, is inappropriate at this stage of the litigation. *Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003).

## III. ANALYSIS

Defendant challenges only the typicality, adequacy, and predominance requirements. The Court will analyze all Rule 23(a) and 23(b) requirements but will focus on the contested elements.

### A. <u>Numerosity</u>

"[A] proposed class must be 'so numerous that joinder of all members is impracticable.'" *Rannis v. Recchia*, 380 Fed. App'x 646, 650 (9th Cir. 2010) (quoting Fed. R. Civ. P. 23(a)(1)). While "[t]he numerosity requirement is not tied to any fixed numerical threshold[,] . . . [i]n general, courts find the numerosity requirement satisfied when a class includes at least 40 members." *Id.* at 651.

Defendant does not dispute that many Products have been sold. Given the large number of potential class members, and that Defendant does not dispute the

numerosity of the proposed classes, the Court finds the number of members is sufficiently numerous that joinder is impracticable, and therefore finds this requirement is fulfilled.

### B. Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy this requirement, "[a]ll questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). The common contention, however, "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.

Plaintiffs assert that there are "numerous common questions of law and fact, such as whether the challenged statements are unlawful, unfair, deceptive, or misleading when affixed to products containing [7 to 12] grams of [added] sugar per serving." (Mot. at 13–14 (quoting *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1093–94 (N.D. Cal. 2018) (alterations added by Plaintiffs).) A determination on the truth or falsity of the Products' labels "will resolve an issue that is central to the validity of [plaintiffs'] claims in one stroke." *Forcellati v. Hyland's, Inc.*, No. CV 12-1983-GHK (MRWx), 2014 WL 1410264, at *8 n. 5 (C.D. Cal. Apr. 9, 2014). The Court finds that because the Products all convey a similar message, an evaluation of this message can be performed on a class-wide basis. Commonality is fulfilled.

### C. Typicality

The class representative's claims or defenses must be typical of those of the class. Fed. R. Civ. P. 23 (a)(3). The Ninth Circuit has explained, "representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Staton*, 327 F.3d at 957; *Hanlon*,

150 F.3d at 1019.  The test of typicality "is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985).  Here, Defendant alleges that all three named Plaintiffs are atypical.

Plaintiff McMorrow.  Defendant first attacks Plaintiff McMorrow's typicality because he "engages in activities that dramatically increase his risk of suffering the harmful health effects he blames on belVita biscuits, including smoking cigarettes and drinking sodas."  (Mot. at 29.)  This is not typical of a consumer who seeks to limit his or her added sugar intake.  (*Id.* at 30.)  A similar argument was rejected by the court in *Hadley*, which held

> none of Plaintiff's claims require Plaintiff to prove that he or any other class member was physically harmed as a result of Kellogg's alleged misconduct. Instead, Plaintiff 'is seeking to recover for the *economic* injury caused by Kellogg representing that its . . . foods are healthy.' Thus, Plaintiff's claims will be evaluated according to an objective 'reasonable consumer' standard. As a result, the 'activities' in which Plaintiff engaged that might have physically affected Plaintiff are irrelevant to the resolution of any claims in the instant case, and therefore cannot render Plaintiff 'subject to' any "unique defenses."

324 F. Supp. 3d at 1120 (citation omitted).  The Court agrees and finds McMorrow to be typical of the class.

Plaintiff Ohlin.  Defendant asserts that Ohlin admitted that he "did not actually review belVita's labeling until 2017—*after* he stopped purchasing belVita biscuits."  (Mot. at 30.)  At his deposition, Ohlin was asked, "[p]rior to 2017, did you look at labels for food packaging?" and Ohlin stated "no" and specified (unclearly), "I wouldn't really acknowledge them as much as I – as what they were actually fully telling me."  ("Ohlin Depo.," ECF No. 91-23, at 22:19–25.)  But Ohlin also stated that when he bought Defendant's Product, he "know[s] he saw the '4 hours of nutritious steady energy'" and he relied on the statement in buying the Product.

("Ohlin Depo. Part Two," ECF No. 70-6, at 150:13–18, 151:17–23.) Therefore, the Court finds that Ohlin sufficiently read the labels and is not atypical for this reason.[3]

Plaintiff DiGregorio. At her deposition, DiGregorio was asked whether she was alleging that the Products "have too much sugar" and she responded, "I don't think I said that." ("DiGregorio Depo.," ECF No. 91-24, at 89:19–25.) Defendant vaguely argues, but provides no cites for the argument, that this lack of knowledge renders DiGregorio atypical. Regardless of exactly what DiGregorio knows of the suit, her false labeling claims are certainly typical of those of the class. To the extent Defendant is arguing that this shows DiGregorio has insufficient knowledge about the case and is not an adequate representative, the Court disagrees.

"Just where the dividing line is between what a class representative plaintiff should know herself and what she can safely leave to her counsel is somewhat unclear." *Tria v. Innovation Ventures, LLC*, No. CV 11-7135-GW(PJWx), 2013 WL 12324181, at *8 (C.D. Cal. Feb. 25, 2013). On the one hand, "[c]ourts have held that a class representative who is unfamiliar with the case will not serve the necessary role of check[ing] the otherwise unfettered discretion of counsel in prosecuting the suit. Courts have developed a standard of 'striking unfamiliarity' to assess a representative's adequacy in policing the prosecution of his or her lawsuit." *Welling v. Alexy*, 155 F.R.D. 654, 659 (N.D. Cal. 1994). On the other hand, courts have found named representatives to be adequate if they understand the alleged violations, the "underlying legal basis" of the action, or "the gist of the suit." *Stuart v. Radioshack Corp.*, No. C-07-4499 EMC, 2009 WL 281941, at *11 (N.D. Cal. Feb. 5, 2009) (collecting cases). Here, DiGregorio has demonstrated a general understanding of the claims and this lawsuit, (*see* "DiGregorio Reply Decl.," ECF No. 98-3, at

---

[3] Defendant also asserts Ohlin's understanding of the word "nutritious" is atypical. Defendant cites Ohlin's deposition for the proposition that Ohlin has a "poor understanding of basic nutritional concepts." (Opp'n at 30 (citing Ohlin Depo. at 56:22–57:1).) This argument is hardly worth mentioning because Defendant has absurdly and incorrectly portrayed Ohlin's testimony, and Ohlin does not even discuss his understanding of the word "nutritious."

¶¶ 2–4), and the Court finds her to be typical and adequate.

### D. Adequacy

Federal Rule of Civil Procedure 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." "To determine whether the representation meets this standard, [courts] ask two questions: (1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Staton*, 327 F.3d at 957.

Defendant argues that McMorrow is not an adequate representative because he "has been convicted of multiple crimes of moral turpitude, including felony grand theft and passing a bad check." (Opp'n at 29.) McMorrow declares that the two criminal charges occurred 23 and 30 years ago, and he has not had any further convictions since then. ("McMorrow Reply Decl.," ECF No. 98-1, ¶¶ 9, 11.) The Court finds these convictions from long ago do not "remain strongly probative of a lack of personal integrity" and that the convictions do not prevent McMorrow from adequately representing the class. *See White v. E-Loan, Inc.*, No. C 05-2080 SI, 2006 WL 2411420, at *3 (N.D. Cal. Aug. 18, 2006) (finding same).

Defendant has not presented any potential conflicts of interest or arguments that Plaintiffs' counsel is inadequate, and the Court knows of no information that would render counsel inadequate. The Court finds counsel to be adequate.

### E. Predominance

The predominance analysis focuses on "the legal or factual questions that qualify each class member's case as a genuine controversy" to determine "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623 (1997); *see also* Fed. R. Civ. P. 23(b)(3) (to certify a class, the court must find that "questions of law or fact common to class members predominate over any questions affecting only individual members"). "[T]he common questions must be a significant aspect of the case that

can be resolved for all members of the class in a single adjudication." *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014) (internal quotation, brackets and alteration omitted).

Defendant presents several arguments as to why it believes the predominance requirement is not met. The Court focuses on issues relating to Plaintiffs' damages model and Plaintiffs' experts Dr. J. Michael Dennis and Colin Weir.

### 1. Summary of Dennis' and Weir's Opinions and Reports

Dennis was retained "to provide a proposed method for calculating damages in this matter on a class-wide basis, and if ultimately called upon to do so, perform the analysis, which will measure the market price premium attributable to the challenged claims in this matter." ("Dennis Report," ECF No. 91-17, at ¶ 18.) Dennis designed a conjoint survey. He describes a conjoint survey as a method used to isolate and measure the value of an individual product attribute. (*Id.* ¶ 22.) In a conjoint survey, the participants are shown 3 or 4 products and asked to choose which of the products, if any, they would purchase. (*Id.* ¶ 23.) Respondents repeat the choice task 12 to 20 times (with different sets of products each time) and the survey reveals "their preferences for specific attributes." (*Id.* ¶ 26.) This provides companies with data points "from which the market price premium attributable to a particular attribute can ultimately be determined." (*Id.*)

Plaintiffs did not ask Dennis to perform a survey, instead, they asked him to report on how he would design and conduct a reliable survey to measure whether the challenged claims on the Products' labels cause any market price premium. (*Id.* ¶ 30.) Dennis' survey will produce data that will "provide a source of data for [Plaintiffs' damages expert] Mr. Weir to analyze and calculate the amount of economic damages suffered by class members that is specifically attributable to the challenged claims used by Defendant on its Products." (*Id.* ¶ 49.)

Dennis will interview and survey consumers who have recently purchased Defendant's products. (*Id.* ¶ 67.) The customers "will be shown three different

products with randomized levels of the attributes." (*Id.* ¶ 71–72.) Below is an example of a choice task for a respondent:

| | PRODUCT A | PRODUCT B | PRODUCT C |
|---|---|---|---|
| **If these were your only options at the store, which of these 5-pack BREAKFAST BAR OR BISCUIT products would you purchase in real life?** | | | |
| Brand | Nature Valley Breakfast Biscuits | belVita Breakfast Biscuits | belVita Breakfast Biscuits |
| Flavor | Honey | Golden Oat | Chocolate |
| Label Claims on Front of Package | Nutritious Steady Energy Made with Real Honey | 4 Hours of Nutritious Steady Energy 19g Whole Grain per 50g serving | Made with Whole Grains No high fructose corn syrup |
| Nutritional Information | 180 Calories / 2g Sat Fat / 160 mg Sodium / 15 g Sugars | 230 Calories / 0.5 g Sat Fat / 220 mg Sodium / 10 g Sugars | 200 Calories / 1.5 g Sat Fat / 110 mg Sodium / 9 g Sugars |
| Price (not including tax) | $2.79 | $3.29 | $2.79 |
| Select one for purchase | ○ | ○ | ○ |
| None of these | | ○ | |

(*Id.* ¶ 91.) The idea is, if the respondent highly values the "4 Hours of Nutritious Steady Energy" claim from Product B, the respondent will show he or she is willing to pay extra for that product. The respondent will make product choices across 12 choice tasks similar to this one, and his or her value for certain attributes will be revealed. (*Id.* ¶ 92.)

Weir opines that "Dr. Dennis' conjoint survey is properly designed to measure the price premium paid due solely to the presence of the Claims on the Products." (Weir Report, ECF No. 91-16, ¶ 39.) Weir will use the results of the survey as an input in his price premium damages calculation. (*Id.* ¶ 41.)

### 2. Analysis

Dennis' survey proposes to measure the effect of the following challenged claims in their entirety: "NUTRITIOUS SUSTAINED ENERGY"; "NUTRITIOUS STEADY ENERGY ALL MORNING"; and "4 HOURS OF NUTRITIOUS STEADY ENERGY". (Dennis Report ¶ 82.) Defendant argues that Dennis's survey is flawed because he did not pinpoint the survey issues around the word "nutritious"—i.e., he should have determined if customers would pay a price

premium simply based on the claim that the products are "nutritious" even in the presence of "excessive" added sugar. (Opp'n at 25.) Plaintiffs argue Dennis' method was correct, pointing out that they challenge the entirety of the claims. ("Reply," ECF No. 98, at 8.) Plaintiffs' proposed conjoint analysis therefore proposes to test the use of the entire challenged statements and the value that consumers place on the statements. (*Id.*)

Dennis admits his proposed survey does not focus on whether customers would pay a price premium after seeing the word "nutritious" on a label; instead, he focused on the entirety of the challenged claims. ("Dennis Depo.," ECF No. 91-25 at 103:13–104:17; *see id.* at 105:6–9 ([M]y own point of view . . . is that the plaintiffs' theory of liability . . . is challenging this entire claim."). He designed the survey "to have either [the] claim all the way in or not at all" and did not focus on the word "nutritious." (*Id.* at 107:5–6.) The survey is designed to compare for consumers a product that has the claim (as a whole) versus a product that does not. (*Id.* at 104:6–9.)

The issue is whether Plaintiffs identify issues with the whole claims on the labels, rather than simply the use of the word "nutritious." Focusing first on Plaintiffs' operative Complaint, Plaintiffs spend a copious amount of time and space discussing sugar. The Complaint dedicates almost 40 pages to what Plaintiffs deem "facts" about the amount of sugar the average person needs and consumes and the danger of added sugars. (*See generally* SAC.) Plaintiffs repeatedly refer to the Products as "the High-Sugar belVita Products." (*See, e.g.,* ¶ 170.) Plaintiffs allege the Products' labels are misleading because they are unhealthy. (*Id.* ¶¶ 129, 134, 139, 144, 152.) And while Plaintiffs lay out the "challenged claims" in their entirety, (e.g., "NUTRITIOUS STEADY ENERGY") no portion of the Complaint specifically alleges that the Products are misleading because they in fact do not provide the consumer with energy.

Focusing next on Plaintiffs' Motion for Class Certification. Plaintiffs move to

certify classes of persons who purchased the belVita products bearing the phrases "NUTRITIOUS STEADY ENERGY," "NUTRITIOUS SUSTAINED ENERGY," or "NUTRITIOUS MORNING ENERGY." Plaintiffs argue that the challenged claims are misleading because "BelVita Products . . . contain 7g to 12g of added sugar per serving, contributing between 14% and 21% of their calories. Thus, they are not healthy." (Mot. at 7 (citation omitted).) Plaintiffs allege Defendant knew that its health messages are misleading because it "knew the detrimental health effects of added sugar" and knew that "consumers lacked adequate knowledge of" the dangers of added sugar. (*Id.* at 8, 10.) Despite this knowledge, Defendant "forged ahead with its prominent 'NUTRITIOUS' claims, using marketing to mask its true health credentials (or lack thereof)." (*Id.* at 10.) Plaintiffs claim Defendant worked hard to ensure that its Products were associated with "health" and that the terms "nutritious" and "healthy" meant the same thing. (*Id.* at 5.) Plaintiffs and other consumers paid a price premium for the Products because consumers "are willing to pay more for foods perceived to be healthy." (*Id.* at 12.)

Nowhere in the Motion do Plaintiffs claim that the Products' labels are misleading because the Products in fact do not provide the consumer with energy. Nowhere do Plaintiffs claim that Defendant knew that the Products do not provide the consumer with energy. Plaintiffs do not claim they paid more money because they wanted a breakfast product that gave them energy. It is not until the reply brief that Plaintiffs provide, "[the] claims in their entirety—not just the word 'nutritious' within them—'convey a message that the Products are healthy and will not detriment health, which is misleading because the products are actually unhealthy.'" (Reply at 1 (citing SAC ¶ 144).) And while it is true that Plaintiffs' Complaint broadly takes issue with the claims in general, it is clear that the reason why Plaintiffs allege the claims to be misleading is because of the sugar content of the Products combined with the use of the word "nutritious." (*See* SAC ¶ 144.) It is illogical that Plaintiffs would allege that the Products are misleading because they claim to provide "steady

energy" but are in fact unhealthy. There is no connection between a product claiming to provide energy and it claiming to be healthy. And Plaintiffs provide no link between the amount of sugar in the Products and the claim of steady energy. Instead, the Complaint makes clear that Plaintiffs allege that the labels are misleading because the labels claim the Products are "nutritious" but the Products are actually unhealthy due to the sugar content. (*See id.* ¶¶ 129, 152.)

Plaintiffs cannot successfully argue that they are bringing a claim that revolves around the Products' promise of "energy" as Plaintiffs provide no details of that allegation in their Complaint and give Defendants insufficient notice of such a claim. A plaintiff's claim that a product label is misleading must provide the defendant with notice of what exactly it is about the label that is misleading. Plaintiffs cannot now claim that they find the claim of "steady energy" misleading. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (holding the complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests").

And Defendant understandably relied on Plaintiffs' focal allegation that the Products are unhealthy due to the amount of added sugar. To combat Plaintiffs' claims, Defendant hired expert witness Dr. Itamar Simonson "to assess the effect of the term 'nutritious' on belVita consumers when used in the context of the Energy Claims." (ECF No. 113, at 1.) Dr. Simonson's survey "compared two versions of the belVita packaging that differed only in the presence or absence of the term 'nutritious.'" (*Id.*) Defendant did not hire an expert to test the effect of the claims in their entirety, nor does Defendant's expert opine on the Products' claim of energy.

Further, even Plaintiffs did not generate evidence to dispute the energy claim. Plaintiffs hired Dr. Robert H. Lustig as an expert to "[s]ummarize relevant scientific and medical literature regarding the physiological metabolism and effects of added sugar consumption on the human body, both generally and specifically in relation to the types and amounts in the challenged breakfast products." (ECF No. 101, at 1.) At his deposition, Mr. Lustig specifically stated he was not giving an opinion as to

the notion that the Products provided steady nutritious energy. ("Lustig Depo.," ECF No. 114-11, at 110:5–8.) Mr. Lustig does not have any data that can address "the four-hour energy thing." (*Id.* at 110:15–19.) Plaintiffs further designated Dr. Michael Greger who opines that the belVita Breakfast Biscuits are not healthy. (ECF No. 100, at 3 (citing Greger's declaration).) He reasons that the Products contain "approximately 7g and 12g of added sugar per serving accounting for approximately 14% to 21% of their calories." (*Id.*) Any added sugar that accounts for more than 5% to 10% of a food product's calories can have "unacceptable adverse metabolic effects." (*Id.*) Dr. Greger does not opine on the Products' energy claims.[4]

Plaintiffs provide no expert witness and no data regarding the energy claim, and Plaintiffs' counsel states, "[a]lthough Plaintiffs maintain that it is irrelevant to their theories of liability, they can nevertheless, if deemed necessary by the Court, submit evidence disputing that the challenged belVita products are . . . scientifically proven to provide steady energy for four hours without spikes or crashes." (Joseph Decl., ECF No. 93, ¶ 9.) It is unclear why counsel asserts that the energy claim is "irrelevant" to Plaintiffs' theory of liability, but it is clear that there are no allegations in Plaintiffs' Complaint or Motion for Class Certification that the energy claim is misleading.

A plaintiff must show "damages are capable of measurement on a classwide basis" in a manner "consistent with its liability case." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34–35 (2013) (quotation omitted). "[A] model purporting to serve as evidence of damages in this class action must measure only those damages attributable to [the plaintiff's] theory." *Id.* at 35. Class certification can be denied under *Comcast* "when the proposed price premium (i.e. overpayment) methodology fails to . . . isolate the premium attributable only to the alleged misleading marketing

---

[4] Further, in his deposition, Plaintiff Ohlin was asked whether he relied on the statement "steady energy" when he bought the Product and he said, "I relied on it saying nutritious." (Ohlin Depo. Part Two at 152:2–13.)

statement." 2 McLaughlin on Class Actions § 5:23 (16th ed. 2019).

In *Davidson v. Apple, Inc.*, No. 16-cv-4942-LHK, 2018 WL 2325426 (N.D. Cal. May 8, 2018), the plaintiffs alleged Apple's iPhone touchscreen was ineffective because it was "unresponsive to users' touch inputs." The plaintiffs' expert conducted a survey, but the survey "only asked respondents about a *generic* defect instead of one specifically affecting the phone's touchscreen." *Id.* at *23. Thus, the court found the plaintiffs failed to provide a damages model that is "consistent with [their] liability case." This violated *Comcast*'s requirement that the damages model measure "only those damages attributable" to the plaintiffs' theory of liability "because it unmoors Plaintiffs' damages from the specific touchscreen defect alleged to have harmed them." *Id.* Similarly, in *Opperman v. Kong Technologies, Inc.*, No. 13-cv-453-JST, 2017 WL 3149295 (N.D. Cal. July 25, 2017), the plaintiffs claimed that Apple misrepresented two security features on Apple devices, known as "sandboxing" and the "curated" App Store. Plaintiffs sought class certification, and the court found that plaintiffs' damages model did not satisfy the predominance requirement. *Id.* at *12. The court held that plaintiffs' expert's survey methodology was flawed because it asked the consumers to measure the value of "privacy generally" rather than the value of the specific, challenged privacy features. The expert's "failure to identify the specific attributes to be used in a conjoint survey prevents the Court from finding that it will adequately measure damages." *Id.* at *11. The proposed methodology would overstate plaintiffs' damages. *Id.* at 12.; *see also In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 578 (C.D. Cal. 2014) (holding that Weir's model did not suffice under *Comcast* because plaintiffs' theory of liability was that the products' "100% Natural" label misled consumers and caused them to believe the products contained no GMO ingredients. But Weir calculated the "price premium attributable to use of the term '100% natural' and all of the meanings consumers ascribe to it").

Here, Plaintiffs' claim of liability is that the Products' labels are misleading

due to the amount of added sugar and the use of the word "nutritious." (Mot. at 7.) Dennis' proposed survey asks respondents to compare products with and without the "entire claim" (Dennis Depo. at 105) and therefore cannot determine how consumers value only the word "nutritious" on a label. Plaintiffs intend to use Dennis' survey to conclude that they are entitled to damages. (Mot. at 23.) Plaintiffs' expert Colin Weir opines, "Dr. Dennis' conjoint survey is properly designed to measure the price premium paid due solely to the presence of the Claims on the Products." ("Weir Decl.," ECF No. 91-16, at ¶ 39.) Like Dennis, Weir intends to evaluate the labels' claims in their entirety, for example: "NUTRITIOUS SUSTAINED ENERGY"; "NUTRITIOUS STEADY ENERGY ALL MORNING"; and "4 HOURS OF NUTRITIOUS STEADY ENERGY". (*Id.* at ¶ 5 n.2.)

Had Dennis planned to ask respondents to review a product that claimed "4 hours of steady energy" versus one that claimed to provide "4 hours of nutritious steady energy" then that would be a different case. But currently, his proposed survey does not tell the Court whether the respondents would pay a price premium because the product is advertised as being "nutritious," or because it is advertised at providing "steady energy," or a combination of the two. Plaintiffs' theory of liability is therefore not consistent with their damages model as required by *Comcast*. Plaintiffs have not satisfied the Rule 23(b)(3) predominance requirement.

### F. <u>Superiority</u>

For the sake of completeness, the Court will evaluate the superiority requirement.

"The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case." *Hanlon*, 150 F.3d at 1023. "This determination necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution." *Id.* Here, each member of the class pursuing a claim individually would burden the judiciary and run afoul of Rule 23's focus on efficiency and judicial economy. *See Vinole v.*

*Countrywide Home Loans, Inc.,* 571 F.3d 935, 946 (9th Cir. 2009) ("The overarching focus remains whether trial by class representation would further the goals of efficiency and judicial economy."). Further, litigation costs would likely "dwarf potential recovery" if each class member litigated individually. *Hanlon*, 150 F.3d at 1023. The Products cost only approximately $5 to $15. (Mot. at 25.) "[W]here the damages each plaintiff suffered are not that great, this factor weighs in favor of certifying a class action." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1199 n.2 (9th Cir. 2001) (quoting *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 652 (C.D. Cal. 1996)). Superiority is satisfied.

## IV. CONCLUSION

Because Plaintiffs have not satisfied all requirements of Rule 23(a) and 23(b), the Court **DENIES WITHOUT PREJUDICE** their Motion for Class Certification.[5]

**IT IS SO ORDERED.**

DATED: March 9, 2020

Hon. Cynthia Bashant
United States District Judge

---

[5] Pursuant to Judge Burkhardt's scheduling order, the parties are to contact Judge Burkhardt's chambers within three calendar days of this Order to discuss the schedule of this case going forward. (*See* ECF No. 39.)